IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
*Southern Division*

|  |  |  |
|---|---|---|
| MUNISH K. SAWHNEY, | * | |
| Plaintiff, | * | |
| v. | * | Case No.: PWG-11-3328 |
| VOCUS, INC., | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

This Memorandum Opinion addresses Defendant Vocus, Inc.'s Motion for Summary Judgment, ECF No. 48, and accompanying Memorandum in Support, ECF No. 48-2; Plaintiff Munish K. Sawhney's Memorandum of Points and Authorities in Opposition, ECF No. 53; and Defendant's Reply, ECF No. 54. Having reviewed the filings, I find that a hearing is unnecessary in this case. *See* Loc. R. 105.6. For the reasons stated herein, Defendant's Motion is DENIED IN PART as to Counts I and III, and GRANTED IN PART as to Counts II and IV.

## I. BACKGROUND[1]

Defendant is a company that provides "cloud-based marketing and public relations software." Compl. ¶ 4, ECF No. 1; Def.'s Mem. 3, ¶ 1. Plaintiff began his employment with

---

[1] In reviewing the evidence related to a motion for summary judgment, the Court considers undisputed facts, as well as the disputed facts viewed in the light most favorable to the non-moving party. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009); *George & Co., LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 391–92 (4th Cir. 2009); *Dean v. Martinez*, 336 F. Supp. 2d 477, 480 (D. Md. 2004).

Defendant in late October, 2009 as a "New Business Sales Executive." Compl. ¶ 1; Def.'s Mem. 3. Plaintiff's position entailed selling Defendant's software to customers and, to make sales, "providing web-based demonstrations of Vocus's software to potential customers" by "simultaneously displaying the software on potential customers' computer screens as well as his own and explaining the features of the software." Compl. ¶¶ 2–3; Def.'s Mem. 5, ¶ 10. Plaintiff's employment with Defendant was terminated on June 1, 2010, Compl. ¶ 22, at which time the sales revenue he had generated was below the required amount, *id.* ¶ 19; Def.'s Mem. 12, ¶ 43.

Plaintiff has an eye condition that makes it difficult for him to see. *See* Rosan Y. Choi, M.D. Mar. 22, 2012 Ltr. 2, Pl.'s Opp'n Ex. J, ECF No. 53-13. Plaintiff contends that this condition constitutes a disability under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101 – 12213, and under Maryland law regarding discrimination in employment, Md. Code Ann., State Gov't §§ 20-601 – 20-609. Compl. ¶¶ 27 & 47. According to Plaintiff, at the time he was hired, individuals "who were in supervisory positions at Defendant were aware that Plaintiff had severe Myopia and extremely poor vision in his left eye and required special accommodations in order to perform the job properly." *Id.* ¶ 12.

Plaintiff's four-count Complaint includes claims of failure to accommodate under federal and Maryland law and discrimination based on disability under federal and Maryland law. *Id.* ¶¶ 25–64. Plaintiff alleges that he requested but was not provided with "reasonable accommodation during his training and at the time he was forced to take leave to recover from his retinal hemorrhage." *See id.* ¶¶ 12–18; 28–30. He claims that he requested that his supervisor, Michael Irving, Defendant's Senior Director of Sales at that time, provide Plaintiff's initial training at Plaintiff's desk, "where Plaintiff could view the functionality of the software

properly and learn how to implement data into the customer relations management software tool properly," but "it was not until late February 2010, months after requesting the accommodation, that Irving sat down with Plaintiff to give him proper training on using the computers and programs." Compl. ¶¶ 15–18. According to Plaintiff, even though he ultimately received the accommodations he requested, he was unable to perform his job duties adequately because he was not provided with accommodations during his initial training on company software and because he was not provided with supplementary software training during his first few months working at the company. Pl.'s Opp'n 32–33. In Defendant's view, its provision of accommodations was reasonable. Def.'s Mem. 2.

Plaintiff also claims that he was wrongfully terminated from his position because of his disability. Compl. ¶¶ 37–38. Defendant maintains that Plaintiff was terminated because of, *inter alia*, Plaintiff's "underperformance." Answer ¶ 22, ECF. No. 5. Defendant argues that there is no genuine dispute of material fact as to any of Plaintiff's claims, and that Defendant is entitled to summary judgment in its favor on that basis. Def.'s Mem. 2.

## II. DISCUSSION

Summary judgment is proper when the moving party demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(A); *see Baldwin v. City of Greensboro*, No. 12-1722, 714 F.3d 828, 833 (4th Cir. 2013). If the party seeking summary judgment demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify evidence that shows that a genuine dispute

exists as to material facts. *See Celotex v. Catrett*, 477 U.S. 317 (1986). The existence of only a "scintilla of evidence" is not enough to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). Instead, the evidentiary materials submitted must show facts from which the finder of fact reasonably could find for the party opposing summary judgment. *Id.*

### A. Counts I and III – Plaintiff's Failure to Accommodate Claims[2]

To succeed in his failure to accommodate claims, Plaintiff must demonstrate that: "(1) [he] had a disability within the meaning of the statute; (2) the employer had notice of the disability; (3) [he] could perform the essential functions of [his] position with a reasonable accommodation; and (4) the employer refused to provide the accommodation." *Jeffries v. Gaylord Entm't*, Civ. Nos. PJM-10-0691, PJM-10-2418, 2013 WL 1316382, at *4 (D. Md. March 27, 2013) (citing *Rhoads v. F.D.I.C.*, 257 F.3d 373, 387 n.11 (4th Cir. 2001)); *see Wilson v. Dollar Gen. Corp.*, 717 F. 3d 337, 345 (4th Cir. May 17, 2013). An employee "has the burden of providing to the employer the information necessary for making the reasonable accommodation decision." *Jeffries*, 2013 WL 1316382, at *4. Yet, "[t]he employee does not have to mention the ADA or use the phrase 'reasonable accommodation.' Adequate notice simply informs the employer of both the disability and the employee's need for the accommodations for that disability.'" *EEOC v. Fed. Express Corp.*, 513 F.3d 360, 369 n.5 (4th

---

[2] The state and federal claims are considered together because, when the provisions of federal and later state statutes "are so similar and . . . the common intent behind them is so clear, we may and should be guided by the case law interpretation of the Federal statute when we examine the State analog . . . ." *Wallace H. Campbell & Co., Inc. v. Md. Comm'n on Human Relations*, 33 A.3d 1042, 1052 (Md. Ct. Sp. App. 2011) (citing *Gardner v. State*, 549 A.2d 1171, 1176 (Md. Ct. Sp. App. 1988)). Notably, "Maryland courts have used interpretations of the ADA for guidance when the ADA is substantially similar to the Maryland code at issue." *Lewis v. Univ. of Md., Balt.*, Civ. No. SAG-12-298, 2012 WL 5193820, at *4 n.3 (D. Md. Oct. 18, 2012) (referencing *Ridgley v. Montgomery Cnty.*, 883 A.2d 182, 193 (Md. Ct. Sp. App. 2005)).

Cir. 2008) (citation omitted). Nonetheless, "'[v]ague or conclusory statements revealing an unspecified incapacity are not sufficient to put an employer on notice of its obligations under the ADA.'" *Huppenbauer v. May Dep't Stores Co.*, 99 F.3d 1130, 1996 WL 607087, at *6 (4th Cir. 1996) (citation omitted). The employer need not have "provided the specific accommodation requested ..., or even . . . provide[d] the best accommodation, so long as the accommodation ... is reasonable." *Jacob v. Didlake Corp.*, No. DKC-2006-0342, 2007 WL 178256, at *7 (D. Md. Jan. 22, 2007) (quoting *Scott v. Montgomery County Gov't*, 164 F. Supp. 2d 502, 509 (D. Md. 2001)).

Defendant does not contend that Plaintiff has not shown that he had a disability or that Plaintiff did not inform it of his disability and his need for reasonable accommodations. Rather, Defendant argues that Plaintiff provided notice of his disability later than Plaintiff claims to have provided notice, and "Vocus reasonably accommodated Mr. Sawhney's condition." Def.'s Mem. 17 & 19. Thus, in Defendant's view, Plaintiff cannot establish the second element of his claim, to the extent that he claims that Defendant failed to accommodate his disability during his initial training. *Id.* at 19. Moreover, Defendant argues that, regardless of when Plaintiff disclosed his disability and his need for accommodations, he cannot demonstrate the fourth element of his failure to accommodate claims, i.e., that Defendant refused to provide accommodations to Plaintiff. *Id.* at 17.

Whether Defendant provided reasonable accommodations depends, in part, on when it received notice of Plaintiff's disability and need for accommodations, such that it could provide them. This material fact is in dispute. Plaintiff claims that, "[a]t the time Plaintiff was hired, Irving and others who were in supervisory positions at Defendant were aware that Plaintiff had severe Myopia and extremely poor vision in his left eye and required special accommodations in

5

order to perform the job properly." Compl. ¶ 12. Defendant concedes that, "[s]hortly after receiving his offer of employment, Mr. Sawhney mentioned to Mr. Irving that he was nearsighted and thus would need a sufficiently large computer monitor as well as some personal, one-on-one training at his work station," but it argues that "Mr. Irving did not consider Mr. Sawhney's statements to be a disability-related request for accommodations." Def.'s Mem. 7, ¶ 20 (citation omitted). Defendant contends that it was "[a]fter Mr. Sawhney completed his training" that "Mr. Sawhney . . . told Mr. Irving that he had a condition that affects his retina and impairs his vision." *Id.* at 9, ¶¶ 27–28. Moreover, each provides evidentiary support for its position. *See* Munish K. Sawhney Dep. (Nov. 5, 2012) 9:10–17, Pl.'s Opp'n Ex. E, ECF No. 53-8 (Plaintiff told Mr. Irving before his employment began: "I need to have some support to where I have very poor eyesight. I've very nearsighted. I need a large monitor, plus I need some assistance with somebody training me at my desk with all the software applications that we work with, . . . because being extremely nearsighted and . . . almost blind in my left eye, . . . it's difficult from me to see overhead projector work out there."); Michael Irving Dep. (Nov. 20, 2012), 76:8–10, 77:7–11, 78:2–4, 115:16–18, & 116:15–117:10, Def.'s Mem. Ex. 8, ECF No. 48-10 (Mr. Irving "wasn't aware of the eye condition until [Plaintiff and Mr. Irving] were doing the one on ones after training had finished," at which point they had their "first conversation about the issue regarding his vision" and Mr. Irving learned that Plaintiff "had vision issues" and "had a hard time seeing the screen, that he hadn't seen, been able to see most of the screens during training"; Plaintiff "went into the science behind the issue he has with his eye, which lost [Mr. Irving] on some.").

The parties also dispute what accommodations Defendant provided, and whether they were reasonable under the circumstances. Defendant argues that Plaintiff did not state that he

6

was having any difficulty in the initial training until "[n]ear the end of Mr. Sawhney's two-week training," when Mr. Sawhney mentioned to Dave Lavelle, Defendant's Director of Sales Training at that time, that he was experiencing difficulty seeing all of the information projected on the overhead screen," at which point Defendant accommodated Plaintiff's needs by "immediately . . increas[ing] the size of the image projected on the overhead screen." Def.'s Mem. 8, ¶ 22; *see* David Lavelle Dep. (Oct. 18, 2012) 165:5–7 & 14–16, Pl.'s Opp'n Ex. N, ECF No. 53-17. Additionally, Defendant contends that "[a]round the same time, Mr. Sawhney mentioned to another trainer that he was experiencing difficulty seeing some of the information presented on the group laptop being used during the training; that trainer gave him his own laptop so that he could better follow along." Def.'s Mem. 8, ¶ 23; *see* Sawhney Dep. 19:19–20. Also, Mr. Lavelle "tried to increase the font." Lavelle Dep. 212:1–213:7. However, Plaintiff testified that the laptop "wasn't big enough for [Plaintiff] to see." Sawhney Dep. 19:19–20. Defendant notes that its information technology department also provided a larger monitor for Plaintiff's work station. *Id.* at 21:6–13.

Plaintiff contends that what he needed—and requested—was one-on-one training. Compl. ¶ 15. Defendant asserts that Mr. Irving provided Plaintiff with training videos after the initial training and gave him one-on-one assistance. Def.'s Mem. 9, ¶ 29; *see* Sawhney Dep 28:14–21. Plaintiff insists that he did not receive the necessary one-on-one training until it was too late and he already had been working without sufficient training due to Defendant's failure to provide adequate accommodations. Compl. ¶¶ 16–19; Pl.'s Opp'n 32. He testified that he requested training repeatedly: "[r]ight after November," on December 21, and in January. Sawhney Dep. 146:8–17. Specifically, he asked Mr. Irving to "give [him] some one-on-one training at [his] desk on how [to] navigate through the software, how to . . . be able to properly

demonstrate the software itself." *Id.* at 21:17–20. Plaintiff testified that Mr. Irving was aware that Plaintiff needed one-on-one training "because of [his] unique situation" and Mr. Irving stated that he needed "to figure out . . . when [he could] sit next to [Plaintiff] and work with [him]." *Id.* at 23:6–8. But, according to Plaintiff, Mr. Irving "then . . . just gave [him] the video [and a YouTube link] instead of sitting next to [him]." *Id.* at 23:9–10. As Plaintiff sees it, the videos "were fairly helpful in learning the Vocus PR tool itself, but it wasn't a 100 percent [sic] helpful as having that one-on-one training." *Id.* at 21:21–22:2. In his view, Plaintiff "was at a disadvantage" and not working as effectively as he would have with training "because Mike Irving did not sit next to [him] until later on in the year, . . . February – to train [him] on how to . . . access . . . marketing leads" using "the Salesforce[3] tool properly." *Id.* at 26:7–13 & 27:10–19. Plaintiff also stated that he "was not aware" that he "could have gone to training again twice." *Id.* at 112:22–113:2.

Defendant contends that the delay in Plaintiff's Salesforce training "was reasonable because it only delayed Mr. Sawhney receiving his marketing leads by a few weeks and it was immaterial to his job performance because cold calling was the focus in the beginning of his employment, which did not require Salesforce." Def.'s Reply 2. Additionally, Defendant argues that, "to the extent that using Salesforce was required in the first few months of Mr. Sawhney's job, Mr. Irving did not provide additional training because Mr. Sawhney already knew how to use it and was performing the tasks that required Salesforce proficiently." *Id.* Indeed, Mr. Irving testified that Plaintiff only needed Salesforce for select tasks in November and December 2009, and Plaintiff was using Salesforce competently for those tasks. Irving Dep. 123:9–15.

---

[3] "Salesforce" is a program that Defendant's sales executives used to obtain marketing leads. Sawhney Dep. 14:21–15:1.

8

Additionally, Plaintiff testified that he "knew Salesforce a little bit" at that time. Sawhney Dep. 25:12–13.

Thus, a genuine dispute of material fact exists as to whether Defendant provided reasonable accommodations, i.e., whether the timing and nature of the accommodations was reasonable. On these facts, a reasonable jury could find that Plaintiff has established all of the elements of a failure to accommodate claim. *Jeffries*, 2013 WL 1316382, at *4. Therefore, summary judgment in Defendant's favor on Counts I and III is DENIED. *See* Fed. R. Civ. P. 56(a).

**B. Counts II and IV – Plaintiff's Wrongful Discharge Claims**

To establish wrongful discharge, Plaintiff must show that (1) he "is within the statute's protected class"; (2) he "was discharged"; (3) he "was performing the job at a level that met [his] employer's legitimate expectations" when he was discharged; and (4) his "discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination." *Jacob v. Didlake Corp.*, No. DKC-2006-0342, 2007 WL 178256, at *10 (D. Md. Jan. 22, 2007) (citing *Haulbrook v. Michelin N. Am.*, 252 F.3d 696, 702 (4th Cir. 2001)) (footnote omitted). If Plaintiff makes out a *prima facie* case, the burden shifts to Defendant, which then must "proffer evidence of a legitimate, non-discriminatory reason for the adverse employment action." *Wright v. Sw. Airlines*, 319 Fed. App'x 232, 233 (4th Cir. 2009); *see Ruffner v. MD OMG EMP LLC*, No. WDQ-11-1880, 2012 WL 3542019, at *3 (D. Md. Aug. 13, 2012) (burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800–06 (1973) applies to ADA cases). If the employer does so, the burden shifts back to the employee "to prove by a preponderance of the evidence that the proffered reasons were pretextual." *Wright*, 319 Fed. App'x at 233. In this case, the parties agree that the Plaintiff is disabled within the meaning of

9

the ADA, Compl. ¶¶ 27 & 47; Def.'s Mem. 9, ¶ 28, and that he was discharged, Compl. ¶ 22; Def.'s Mem. 14, ¶ 49. The third and fourth elements are at issue.

With regard to whether Plaintiff met Vocus's expectations for his job performance, *see Jacob*, 2007 WL 178256, at *10, Defendant contends that he did not because "[t]he overriding function of Mr. Sawhney's job was to make sales and there is no dispute that he failed to meet his sales quota." Def.'s Reply 13. Defendant argues that Plaintiff's "sales . . . fell below those expected of a New Business Sales Executive and well behind the other New Business Sales Executives at [Vocus] with similar experience," even though Defendant provided the accommodations that Plaintiff requested. Def.'s Mem. 22. Defendant relies on its March Commissions Summary, which shows "Total Booked" for various employees, including Plaintiff, but does not show what those employees' total sales were for the previous months. Def.'s Mem. Ex. 10, ECF No. 48-12. Defendant notes that "[t]he only sales executive on that chart with lower sales numbers than Mr. Sawhney started after him, had to meet lower quota, and was terminated as well." Def.'s Reply 14 n.3; *see* Christopher Anthony Cutino Dep. (Oct. 26, 2012) 150:8–19, Def.'s Reply Ex. 4, ECF No. 54-4.

Although Defendant provides sparse evidentiary support for its position, it is undisputed that Plaintiff's sales totaled $24,212.50 during his seven months of employment. *See* Pl.'s Opp'n 30; Def.'s Reply 13. It also is undisputed that these sales were less than the quota Defendant expected its new hires to meet. Pl.'s Opp'n 30–31; Def.'s Mem. 13–14. Specifically, new hires were "tasked, in their first six months, to sell $52,500 worth of revenue" in total and then "$35,000 per month, moving forward." Cutino Dep. 155:3–22, Def.'s Mem. Ex. 1, ECF No. 48-3. Thus, the quota for seven months would be $87,500, and Plaintiff only met about 28% of that quota. *See id.*; Def.'s Reply 13–14.

10

Nonetheless, noting that his sales were "around 46.1% of th[e] *six* month quota" of $52,500, Pl.'s Opp'n 19 (emphasis added), Plaintiff argues that his sales were adequate because they "match[ed] the expectations for other sales executives," *id.* at 28. He insists that "others who were not terminated" met a similar or lower percentage of the quota. *Id.* at 30–31. In support, Plaintiff cites Defendant's Response to Plaintiff's Interrogatories, in which Defendant stated that, when it terminated Plaintiff's employment, it "did not terminate the employment of the other five New Business Sales Executives who had been working for Defendant for six months because they were meeting 43%, 47%, 53%, 54%, and 75% of the same sales goals." Def.'s Resp. to Pl.'s Interrogs. 12, Pl.'s Opp'n Ex. I, ECF No. 53-12. Plaintiff states that he "would have been the second lowest of these comparators, but he would have been within the range of that expected by Vocus at the time." Pl.'s Opp'n 35. Even so, Plaintiff has not shown how the other new hires were performing at the end of the seventh month, which is the point at which he was meeting a significantly lower percentage of his quota and was terminated. Nor has he requested additional discovery on this issue. *See* Fed. R. Civ. P. 56(d).

Plaintiff also argues that, based on the feedback he received from his manager and other superiors, he was performing his job satisfactorily. Pl.'s Opp'n 28. Indeed, Mr. Irving stated that, after Plaintiff went through four demonstrations with Mr. Irving coaching, "from a product standpoint he was solid" and he had no "serious deficiencies." Irving Dep. 80:6–9, 82:4–8. Mr. Irving also noted that Plaintiff had "closed [a] deal in December" and "had things in his pipeline for working." *Id.* at 80:16–18. Mr. Irving agreed that Plaintiff "had the ability to sell the product" and "was in the same ball park as other new hires." *Id.* at 81:2–3, 81:16–82:3, 83:14–15. Further, in an interrogatory answer, Plaintiff stated that "[o]nce [he] received [his] training [he] started to make headway and started to close business [and] received a lot of praise from

11

[his] Manager Mike Irving as well as his counterparts Mr. Shawn Cook, Mr. Stewart Marcoon and their boss Matt Melnick VP of Sales," such as when Mr. Melnick "personally came to [Plaintiff's] desk and congratulated [him] on the win of closing a very large account and called [him] a sales superstar." Pl.'s Resp. to Def.'s Interrogs. 12, Pl.'s Opp'n Ex. K, ECF No. 53-14. However, Mr. Irving's assessment of Plaintiff and the feedback Plaintiff received appears to have happened shortly after Plaintiff's large sale in December 2009. Defendant did not terminate Plaintiff until June 2010, and Plaintiff has not shown that Defendant was satisfied with Plaintiff's performance at that time.

Thus, even when viewed in the light most favorable to Plaintiff, the facts do not show that, "*at the time of [his] discharge*" in June 2010, after seven months of employment, Plaintiff "was performing the job at a level that met [his] employer's legitimate expectations." *See Jacob*, 2007 WL 178256, at *10 (emphasis added). Rather, they show that Defendant was satisfied with Plaintiff's performance in late 2009 or early 2010, and that Plaintiff was on par with the other new hires after six months on the job, but fell behind thereafter and was not on target when the decision was made to terminate him. Consequently, Plaintiff has failed to make out a *prima facie* case of wrongful discharge. *See id.* Therefore, summary judgment in Defendant's favor as to Counts II and IV of Plaintiff's Complaint is GRANTED.

### III. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is DENIED IN PART as to Counts I and III, and GRANTED IN PART as to Counts II and IV. Because the parties agreed in their November 19, 2012 Status Report that this matter should be referred to a settlement conference after the dispositive motion was decided, ECF No. 37, I now will refer it for a settlement conference.

A separate order will follow.


Dated: August 13, 2013 /S/
Paul W. Grimm
United States District Judge